By the Court.*—Welles, J.
Upon the trial, in the court *148 below, a number of questions arose upon objections by the prisoner’s counsel, and the rulings and decisions of the court thereon. Also, upon the charge of the court to the jury, and refusals to charge as requested by the prisoner’s counsel.
I shall proceed to consider these questions in the order in which they are presented by the case and bill of exceptions; and
First. In the course of empaneling the petit jury, Benjamin Bennett was called as a juror, and set aside on a peremptory challenge by the District ■ Attorney, to which the counsel for the prisoner objected. It is now insisted that the Act of the Legislature allowing peremptory challenges on the part of the people is unconstitutional and void. (Laws of 1858, ch. 332, § 1, 557). That statute provides that on any trial for any offence punishable by death, or by imprisonment in the State prison for the term of ten years, or for a longer term, the people shall be entitled peremptorily to challenge five of the persons drawn as jurors for such trial, and no more. The challenge under consideration was the only peremptory one interposed by the prosecuting counsel. The enactment seems to be within the plain and obvious scope of legislative power, and is not in conflict with any provision of the Constitution. We think the objection was not well founded.
Second. Eobert C. Thompson was drawn as a juror, and was challenged by the defendant’s counsel for principal cause. Ho fact appears to have been stated when the challenge was interposed, as the cause for which it was made. The juror was then duly sworn, as the case states, but it does not state what was the form or substance of the oath administered to him, when the following examination of the juror and proceeding upon the challenge took place:
Question by the prisoner’s counsel: What is your business, and how long have you resided in the city ?
A. An engineer. I have lived in the city twenty-seven years.
Q. Do you recollect to- have read or heard anything about this case \
A. I do not. I know nothing of the prisoner or the case.
The prisoner’s counsel then said: “We are content with the juror, and withdraw the challenge.”
*149 Question by the District Attorney: You have no conscientious scruples, have you?
A. Yes, I have, sir; I have conscientious scruples.
Question by the prisoner’s counsel: If you were sworn to render a verdict according to the evidence, you would respect your oath, and so do, would you not ?
A. I would, sir; but I should not feel willing to be sworn in the ease.
By the Court: The juror objects to being sworn. I will exclude him.
The prisoner’s counsel objected, which the court noted.
The question in regard to the exclusion of this juror may be summed up in few words. The challenge by the prisoner’s counsel had been withdrawn, when the counsel for the people proved by the juror that he liad conscientious scruples. These scruples evidently related to thé propriety of the death-penalty in any case. It was not so specified in the question to the juror nor in his answer, but it was obviously so understood by him, as the question put to one of the persons called as a juror, and examined just before, contained the specification, and this juror must be presumed, in the absence of evidence to the contrary, to have been present and heard it. It is true he testified that he would respect his oath, and render his verdict according to the evidence, but added, he should not feel willing to be sworn in the case. He was set aside by the court, who specified no other ground or reason for the exclusion than the feeling of unwillingness of the juror to be sworn in the case. If, however, we can see that it was the duty of the court to exclude him as legally incompetent, we should not reverse the j udgment for the reason that the exclusion was put upon an insufficient ground, assuming that such was the fact. A man who honestly believes that Government has not the right to take life as a penalty for crime in any case, which is confessedly the foundation for such scruples of conscience felt by persons called as jurors in capital cases, is clearly not a competent juror for the trial of an indictment where a conviction involves the death-penalty. However faithfully he may intend to render a verdict in strict accordance witli the evidence, and no matter how firmly he may believe he will be able to do so, such is the character of the human mind, so self-deceiving in its operations *150 and their results, that an unbiased verdict could scarcely be expected from a juror thus affected. The more sincere and honest his scruples, the greater the danger of their going with him into the jury-box and contaminating'his verdict. The firm, independent, and impartial administration of public justice, is too important to be left exposed to such improper influences, and such uncertain consequences.
We think the juror was properly excluded.
Several other questions arose upon objections by the prisoner’s counsel in the course of impaneling the jury. They are all, however, disposed of by the views already stated, in considering the objection to the ruling of the court in excluding Thompson as a juror.
Third. It was proved on the part of the people that on a certain Monday morning the deceased was in bed with another woman at a house of ill-fame- in Centre street, in the city of Hew York, when the prisoner broke open the door of the room where they were, entered the room, seized the deceased, dragged her out of the bed, threw her upon the floor, took hold of her head, “made her head go up and down a great, many times,” as one of the witnesses expressed it, and stabbed her with a knife a great many times in her shoulders, back, neck, stomach, legs, and in various other parts of her body; that he was then forced to leave her, and went into the street. This, as it appeared by the evidence, was on the 30th day of November, 1863. She was soon after, and on the same day, taken by the police officers to the city hospital, where she lingered until the 7th day of December, 1863, when she died of the wounds thus inflicted by the prisoner.
The counsel for the people then proposed to prove by a witness on the stand an occurrence between the prisoner and the deceased on the Sunday night previous to the murder, for the purpose of showing the intent of the prisoner. To this the counsel for the prisoner objected, and the objection was overruled by the court. The witness then stated substantially as follows: That the prisoner, on the night before the morning of the homicide, at the house where the homicide occurred, wanted the deceased to go out with him away from the house, and she would not go. That he then struck her and bit her hand, and yet she would not go. He then went out and brought in an *151 officer, and said she had stolen his watch. That the officer took both to the station-house, where they were locked up all night, and both were let out on Monday morning. That the deceased came back to the house and went to bed. Some time after the prisoner followed her to the house and committed the outrages above described. This evidence was entirely proper, for the purpose of showing deliberation and malice on the part of the prisoner, and was properly received by the court.
Fourth. One of the prisoner’s grounds of defence was an alleged variance between the indictment and the evidence, in respect to the name of the deceased, the indictment charging it to be Haney Elizabeth Vincent, and the evidence showing that she went by the name of Lizzie Walters. The prisoner’s counsel proved, and offered to read in evidence, a number of letters addressed to the prisoner under various dates, and signed, some of them Lizzie Walters, and others Elizabeth Walters, and proved to have been written for and at the request of the deceased. The reading of these letters was objected to by the counsel for the people, and the objection was sustained by the court. This decision of the court is now urged as a ground for reversing the judgment. Copies of the letters are annexed to the bill of exceptions, and upon inspection their contents are found to be entirely immaterial to the question of variance, or, indeed, to any other question involved in the trial, except only the signatures, which showed that at the dates of the letters she called her name Walters. That she called her name and went by that name among her associates at the house of prostitution referred to, was proved by all the witnesses introduced on the part of the people called to prove the homicide and its perpetrator, and was not questioned by the public prosecutor. Hone of these witnesses professed to know what her real name was. Some of these letters, in their commencements and conclusions, seemed to indicate that the deceased was the wife of the prisoner ; for example, they commenced, “ My dear husband,” and concluded, “ Your loving wife,” &c., and it was for the purpose of proving that she was in fact his wife, and, therefore, her name must have been Walters, and not Vincent, that the letters were offered in evidence. On objection by the counsel for the people, the letters were excluded. I entertain no doubt of the correctness of this decision. A marriage in fact cannot be thus *152 proved, and, so far as common reputation was concerned, the prisoner had the benefit of all the evidence which he could produce. There was no evidence of cohabitation between the parties, in such a sense as, with the evidence of common reputation in some cases, raises the presumption of marriage. The prosecution had proved that when the priáoner and the deceased were at the station-house together, the evening before the commission of the homicide, the deceased stated in the presence of the prisoner, in answer to questions put to her by the officer who was investigating the prisoner’s charge against her for stealing his watch, that she was not his wife, and that her name was Raney Vincent. It elsewhere appeared that she called her name Raney E. Vincent, and that she sometimes went by the name of Elizabeth. When she denied in presence of the prisoner that she was his wife, and stated her name to be Raney Vincent, he made no objection to her statements. The rule, as I understand it, in a case like the present, is, that "where the deceased went and was called among acquaintances by a name different from his or her true name, the district-attorney may state the true name in the indictment, and if the true name is proved on the trial, there is no variance, although it also appears that the deceased went by another name. So, also, if the name charged in the indictment is not the true name, yet if it is proved that the deceased went and was called among his or her acquaintances by the name charged, it is sufficient, and there is no variance. Here the deceased declared, the evening before the murder, that her name was Vincent, and that she was not the wife of the prisoner. The prisoner was present and made no objection. He was at the same time charging her with stealing his watch, which was impossible if she was his wife. This was quite sufficient to go to the jury, and for them to find that her true name was Raney E. Vincent.
Fifth. There was an attempt made on behalf of the prisoner to prove that at the time he committed the homicide he was laboring under a state of mental derangement, but the testimony did not approximate to even prima, faeia evidence of the fact. Such as it was, it was fairly submitted by the court to the jury, as was also the question of the variance before considered.
*153 Sixth. After the evidence was closed, and the case summed up to the jury by the counsel for the prisoner and the district-attorney respectively, the prisoner’s counsel requested the court to charge three several propositions of law to the jury, as follows:
1st. Premeditated malice cannot be inferred from the manner of the killing, nor the means employed, however cruel the one or dangerous the .other.
2d. That in a case like the present, where the defence consists in the insanity of the prisoner, it becomes incumbent upon the prosecution to prove him sane.
3d. That if Raney E. Vincent was not the name of the deceased, and she was known by and among her acquaintances, and in the community in which she lived, and Elizabeth Walters was the name by which she was so known, the jury must acquit.
The court refused to charge as requested, except so far as the propositions were embraced in the charge he was about to make.
The court then charged the jury upon the various questions arising upon the evidence, in the course of which he said to them : “You must be satisfied that the prisoner committed the murder, and intended at the time to take the life of the deceased. The intent must be completely made out, otherwise you cannot convict of murder. The law presumes malice from the mere act of killing, because the natural and probable consequences of any deliberate act is presumed to have been intended by the author. If the prisoner went to the house with the intent to kill the deceased, or if he went there without intending to kill her, but at the time he got hold of her and pulled her out of bed, a minute before the blow was struck, he conceived the intent to take her life, then he is guilty of murder. But if you are of the opinion, from all the evidence, that he did not intend to take life, but that the blow was struck in the heat of passion, then you can convict of manslaughter in one of the degrees. You must look, gentlemen, at the evidence, in order to gather the intent, or what is termed the malice of the act.”
I am prepared to indorse the law as thus stated by the court. It substantially answers the counsel’s first request to charge. *154 The jury were to judge from all the evidence, and the circumstances attending the homicide, whether the prisoner intended to take the life of the deceased, and, in looking at those circumstances, it was proper for them to take into view the manner of the killing and the means employed; and from- them all, taken together, they would determine the question of the malice aforethought.
Upon the other two propositions I think the charge was correct. As to that one which relates to the defence of insanity, the only evidence on the subject was Dr. Ranney’s letter to the district-attorney, read in evidence to the jury by consent, which is an utter failure to "prove the prisoner insane. Indeed, it proves directly the contrary. The whole matter was submitted to the jury with great fairness, and quite as favorably to the prisoner ás he had a right to require.
On the subject of the misnomer, which I have already considered, the charge, I think, is unexceptionable. It covered the whole ground of the request, and the whole question was fairly submitted to the jury.
It seems to me the prisoner has had a fair trial upon the merits, and that, in the course of it, no rule of law has been violated. The evidence of his guilt is clear and convincing.
I think the judgment of the court below should be affirmed.

 Present, Leonard, P. J., Clerke, and Welles, JJ.